

## IN THE SUPERIOR COURT OF GUAM

PEOPLE OF GUAM,  )  CRIMINAL CASE NO. CF0243-25
                       )
         Plaintiff,  )
                       )  DECISION AND ORDER RE.
      vs.  )  DEFENDANT'S MOTION FOR AN
                       )  EVIDENTIARY HEARING TO
JATHAN JOHN PANGELINAN  )  DETERMINE WHETHER
TEDTAOTAO, aka "Chums",  )  NEW TRIAL IS NECESSARY
                       )
         Defendant.  )
_____ )

## **INTRODUCTION**

This matter is before the Honorable Maria T. Cenzon on Defendant Jathan John Pangelinan Tedtaotao's (hereinafter "Defendant" or "Tedtaotao") Motion for Evidentiary Hearing to Determine Whether New Trial is Necessary (the "Motion") filed on July 25, 2025. The gravamen of the Motion is the claim that the Court violated Defendant's 6th Amendment right to a public trial by excluding Ms. Julianne Hernandez, a reporter for the Pacific Daily News, from a portion of the *voir dire* proceedings held on July 17, 2025.

The People filed an Opposition to the Motion on July 31, 2025.[1] Defendant filed his Reply on August 1, 2025.[2] Following the close of the pleadings, the Court, upon review of the

---

[1] *People's Opp. to Def's Mot. for Evidentiary Hrg. to Determine Whether New Trial is Necessary* (Jul. 31, 2025).
[2] *Reply To Opp. to Mot. For Evidentiary Hrg. to Determine Whether New Trial is Necessary* (Aug. 1, 2025).

submissions of the parties, has determined that, pursuant to CR 1.1(g)(1) and (4)(B), no further oral argument on the Motion is necessary. Upon consideration of the submissions of the parties, the record on file in this case and the applicable rules, statutes and case law, the Court now **DENIES** Defendant's Motion for an evidentiary hearing and, in the alternative, for a new trial.

## RELEVANT FACTS

Defendant is currently on trial for the following charges: (1) **Attempted Murder (As a 1st Degree Felony)**, Special Allegation: Possession and Use of a Deadly Weapon in a Felony, Notice: Commission of a Felony While on Felony Release; (2) **Kidnapping (As a 1st Degree Felony)**, Special Allegation: Possession and Use of a Deadly Wepon in a Felony, Notice: Commission of a Felony While on Felony Release; (3) **Kidnapping (As a 1st Degree Felony)**, Special Allegation: Possession and Use of a Deadly Wepon in a Felony, Notice: Commission of a Felony While on Felony Release; (4) **Aggravated Assault (As a 2nd Degree Felony)**, Special Allegation: Possession and Use of a Deadly Weapon in a Felony, Notice: Commission of a Felony While on Felony Release; (5) **Aggravated Assault (As a 3rd Degree Felony)**, Special Allegation: Possession and Use of a Deadly Weapon in a Felony, Notice: Commission of a Felony While on Felony Release; (6) **Aggravated Assault (As a 3rd Degree Felony)**, Special Allegation: Possession and Use of a Deadly Weapon in a Felony, Notice: Commission of a Felony While on Felony Release; and, (7) **Destruction of Evidence (As a Misdemeanor)**.[3]

---

[3] *Superseding Indictment* (June 30, 2025). Subsequent to the filing of the Superceding Indictment, co-defendant Jeromy Moe John Pangelinan placed his mental state at issue. Due to Defendant's assertion of his right to speedy trial, the Court severed the trial of the defendants pending determination of Pangelinan's competency to be proceeded against and to be sentenced. See, *Order Severing Defendant Pangelinan from CF0243-25 Pending Competency Determination* (Jul. 11, 2025). The trial of the charge of Commission of a Felony While on Felony Release for each felony charge has been bifurcated and will proceed after the trial on the underlying charges and special allegations attendant thereto.

## The Media Requests

As Defendant correctly notes, "[o]n July 17, 2025, Ms. Julianne Hernandez of the Pacific Daily News attended and observed the jury selection in this case." *Motion* at 3. Ms. Hernandez is a credentialed member of the Media pursuant to Rule 4 of the Judiciary of Guam Rules Governing Electronic Coverage of Judicial Proceedings (the "Media Rules"). *Supreme Court Case No. PRM16-001*, Promulgation Order No. PRM16-001-01 (Aug. 11, 2016); http://www.guamsupremecourt.com/Promulgation-Orders/images/PRM_16-001-01.pdf. "Media" is defined in the Media Rules as "includ[ing] any organization or person who regularly gathers, prepares, photographs, records, broadcasts, writes, edits, or publishes news or information about matters of public interest in any medium and who successfully applies to participate in electronic coverage *and agrees to comply not only with the Rules, but with all court rules.*" Rule 2(f)(emphasis added).

On July 15, 2025, as mandated under Rule 7 of the Media Rules, Ms. Hernandez submitted a request for authorization (the "Request") to electronically cover the Proceedings in this case. See, *Media Request for Electronic Coverage of Judicial Proceedings* (July 15, 2025), which is a part of the record on file of this case. See also, *Exhibit A* to this Decision and Order. Ms. Hernandez's application indicated the following:

> I understand that jury selection is tomorrow (7/16) but this is for the duration of the trial itself and time fo [sic] has not been set yet. Was at the hearing in Judge Maria Cenzon's court that jury selection may continue Friday and opening statements might start next week.

*Id.* The Court noted, additionally, that "JURY SELECTION CONTINUES THIS AFTERNOON (7/17) AT 1:30 PM WITH OPENING STATEMENTS AND GOV'T'S CASE IN CHIEF AROUND 3 PM." *Id.* The Request contains a "Certification" as follows:

> I certify that if the judge permits media coverage in this case, all participating personnel in this media organization will be informed of and will abide by the provisions of the Judiciary of Guam Rules Governing Electronic Coverage of Judicial Proceedings, the provisions of any court order, and any additional instructions or restrictions imposed by the judge or the Judiciary.

*Id.* The Court approved the Request with the following additional instructions: "SUBJECT TO [THE] RULES, INCL. NO VIDEO/STILL OF COURTROOM CLERK MS. BALBAS OR JUDGE." *Media Request For Electronic Coverage of Judicial Proceedings* (July 17, 2025).[4]

Rule 10(f) of the Media Rules specifically addresses the movement of the media personnel during proceedings and mandates as follows:

> **f. Movement during Proceedings.** Equipment and personnel may be installed in or removed from the courtroom only when the court is not in session. In addition, such equipment shall at all times be operated from a fixed position. Media personnel *are prohibited from moving about the courtroom while judicial proceedings are in session and from engaging in any movement that attracts undue attention*.

Rule 10(f)(emphasis added). Rule 11 provides that "no appellate review of the interpretation or application of the Rules shall be available to the media or the parties. The media or parties may, however, seek extraordinary relief by way of writ petition." Rule 12 imposes sanctions upon

---

[4] Although Ms. Hernandez submitted an older version of the Media Request, this Court still approved it despite that it did not contain the specific form of media used to record the proceedings. See, Media Request for Electronic Coverage of Judicial Proceedings at http://www.guamsupremecourt.com/for-Media/images/mediaapp.pdf. Notably missing from Ms. Hernandez's application is Paragraph 4, which is contained in the updated form: "I request permission to record courtroom proceedings using ☐ video ☐ audio ☐ still photography." Moreover, the Media Request was untimely, as it was submitted less than "three (3) business days prior to the judicial proceeding." *Media Request* at ¶ 3.

media for a violation of the Rules by declaring that such a violation "is an unlawful interference with the judicial proceedings of the court and may be the basis for an order terminating electronic coverage, an order for contempt of court, cancellation or suspension of media credentials or an order imposing monetary or other sanctions." *Id.*

On July 22, 2025, Shane Healy, as an employee of media organization The Guam Daily Post, submitted an application for Media Request. The Court approved Mr. Healy's application with a similar notation: "[Approved] SUBJECT TO THE RULES RE MEDIA COVERAGE AND REMINDER THAT IF IN COURTROOM, MUST REMAIN UNTIL COURT TAKES A BREAK IN THE PROCEEDINGS. NO IMAGES OF JUDGE OR CLERK BRIANNE BALBAS." *Media Request for Electronic Coverage of Judicial Proceedings* (July 28, 2025).

## Jury Selection Begins on July 16 and ends on July 18, 2025

Jury selection commenced on July 16, 2025, and continued on July 17, 2025, concluding on July 18, 2025. On July 16, 2025, 100 jurors reported for jury duty to begin *voir dire*. The Court recessed for the day at 5:31 PM, and, after giving them recess admonishments, ordered the remaining jurors to report by 1:00 PM on July 17, 2025, to resume *voir dire*. At the close of the first day of jury selection, 81 jurors remained. The proceedings ended on July 16, 2025, at 6:10 PM. *Minutes Asserted Jury Selection and Trial – Day 1 on 7/16/2025* at 1:30:06 PM to 6:10:03 PM (Jul. 16, 2025).

On the afternoon of July 17, 2025, the remaining 81 jurors reported for continued *voir dire*. However, for the first approximately 20 minutes of the hearing, Juror #83085 was queried on her competency to serve as a juror based upon her English language ability, as she had indicated that she did not understand a majority of the proceedings and her primary language is Korean. *Minutes*

*Asserted Jury Selection and Trial – Day 2 on 7/17/2025* at 1:58:20 PM to 2:27:22 PM (Jul. 17, 2025).[5]

As *voir dire* of the panel proceeded through the afternoon, the jurors occupied all of the seats in the jury box, all of the seats in the center of the courtroom to the left of the jury box (both in the gallery and in the well) and several rows on the right gallery (defendant's side), including several chairs right by the courtroom door. However, a row of seats behind the jurors was available for members of the public and media to observe the proceedings. The Court notes that, prior to bringing the jury into the courtroom for continued *voir dire*, Mr. Jason Lujan, an investigator with the Office of the Attorney General, entered the courtroom to observe the proceedings and the Court instructed Mr. Lujan that he was to sit on the right gallery, and further directed him to sit in the last row, so as to minimize any distractions to the court or to during the *voir dire* of the venire. See also, *People's Opp.* at 2. In addition to Mr. Lujan, the Court notes that Attorneys Jacqueline Terlaje and Kristine Borja entered the courtroom during the jury selection, as did Ms. Hernandez – all of whom were seated behind the jurors in the right gallery. Some jurors were still seated on the chairs by the right gallery door, the only means of ingress and egress. It is further notable that both pulling on the handle of the courtroom doors when entering and pushing on the handle of the courtroom doors when exiting the courtroom makes a loud sound that is distracting in an otherwise quiet

---

[5] The Court ultimately excused Juror #83085 on the basis that she was not qualified to serve as a juror pursuant to 7 GCA § 22105(d) ("A prospective juror is disqualified to serve as a juror if he ... (d) is unable to read, write, speak, and understand the English language ... ". The Court also cited to *United States v. Pineda*, 743 F.3d 213, 217 (7th Cir. 2014)("It is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired. [citations omitted]. This court will not overturn the trial court's decision to dismiss a juror pursuant to Federal Rule of Criminal Procedure 24 [identical to 7 GCA § 22105(d)] unless *no legitimate basis* for the court's decision can be found in the record, and the appellant shows that the juror's dismissal prejudiced his case.")

courtroom. This loud sound is minimized if the individual slowly and deliberately pushes on the handle, being mindful of the noise. As such, when Terlaje, Borja and Hernandez entered the courtroom, the Court observed that, in addition to the Court, the jurors were distracted by their entry and looked to see who entered the courtroom, rather than focusing on the Court and *voir dire* questions.

When Ms. Hernandez left the courtroom in the middle of the jury selection while the Court was addressing the venire, her departure was distracting to the Court and to the jurors as she did not take care to open the door in a way to minimize the noise. Ms. Hernandez is often in this Court's courtroom and is aware of the loud sound that is caused by opening and closing the doors upon entering and leaving the courtroom. Ms. Hernandez attended the hearing as a member of the press and, therefore, agreed to abide by the Media Rules, which include the following:

> **Rule 10. Technical Requirements.**
> …
> **c. Setup of Personnel and Equipment.** *All media personnel* and equipment *must be in place at least fifteen minutes prior to the scheduled time of commencement of the judicial proceeding.*
> …
> **f. Movement during Proceedings.** Equipment and *personnel may be installed in or removed from the courtroom only when the court is not in session.* In addition, such equipment shall at all times be operated from a fixed position. *Media personnel are prohibited from moving about the courtroom while judicial proceedings are in session and from engaging in any movement that attracts undue attention.*

(Emphasis added). On July 17, 2025, Ms. Hernandez's entry into and departure from the courtroom, which attracted undue attention to her and away from the proceedings, resulted in this Court instructing the marshals not to allow her to return until a break in the proceedings. However, that afternoon, because of the late start, the Court did not take a break during jury selection, but

instead permitted jurors to be escorted to the restroom by the marshals during a sidebar discussion with other jurors and counsels.[6]

Jury selection continued until July 18, 2025, beginning at 9:05 AM until a jury of twelve (12) with four (4) alternates was empaneled at 11:16 AM. *Minutes Asserted Jury Selection and Trial – Day 3 on 7/18/2025* at 8:59:41 AM to 11:20:12 AM (Jul. 18, 2025). The Jurors were then admonished to return to court for the beginning of trial on July 28, 2025, at 8:30 AM. *Id.* The Court notes that, during the jury selection on July 18, 2025, it admonished members of the marshal division for disrupting the Court's attention by taking jurors to use the facilities at this point in the selection, when jurors were being seated for the panel. Unnecessary movement, while the Court is engaged in selecting a fair, impartial and unbiased jury, is distracting to the Court, who is charged with safeguarding the Defendant's Sixth Amendment right to an impartial jury jurors by ensuring that the jurors are attentive and that the Court is not distracted in performing its duty of ultimately determining whether a juror is qualified to sit as a member of the jury panel.

**Defendant's Motion**

On July 25, 2025, Defendant filed the instant Motion asserting that the Court had partially closed the courtroom to the Press and, therefore, Defendant's "constitutional rights to a public trial have been violated, and the Court must order a new trial in this matter or somehow attempt to justify the orders provided to the marshal to exclude the press or any member of the public." Motion at p. 4. On July 28, 2025, the Court briefly addressed the Motion at sidebar. (*Id.* at 9:10

---

[6] While the Court observed Ms. Terlaje and Ms. Borja depart from the courtroom and return, the Court notes that they exited carefully from the courtroom, deliberately ensuring that they did not cause undue distraction with the sound of the opening of the courtroom doors.

AM to 9:14 AM) and scheduled briefing on the Motion. The People filed an Opposition on July 31, 2025. Defendant filed his Reply on August 1, 2025.

**Trial Begins on July 28, 2025**

After the Court addressed the parties outside of the presence of the jury, trial commenced on July 28, 2025. The Jury was brought into the courtroom, the Court gave the jurors preliminary instructions, and the People delivered its Opening Statements. *Minutes Asserted Jury Selection and Trial – Day 4 on 7/28/2025* at 9:23:44 AM to 9:45:26 AM (Jul. 18, 2025). The Defendant reserved his Opening Statements. *Id.* The Court observed Ms. Hernandez to be present at the commencement of trial and at other times during the proceedings.

## LEGAL ANALYSIS

**A.      The Court has the authority to preserve order and decorum in the Courtroom during proceedings before it.**

Superior Court of Guam judges have the power to, *inter alia*: (a) preserve and enforce order in its immediate presence, (b) enforce order in the proceedings before it, (c) provide for the orderly conduct of proceedings before it; (d) control, in furtherance of justice, the conduct of all persons in any manner connected with a judicial proceeding before it in every matter appertaining thereto. 7 GCA § 7101. Additionally, where media have requested court approval to cover judicial proceedings, Promulgation Order No. *PRM16-001-01 Re: ADOPTION OF JUDICIARY OF GUAM RULES GOVERNING ELECTRONIC COVERAGE OF JUDICIAL PROCEEDINGS* (Aug. 11, 2016)(the "Media Rules") applies to all credentialled media who seek approval of a Media Request pursuant to these rules. Ms. Hernandez submitted her Media Request on July 15,

2025, which was approved on July 17, 2025. See, *Exhibit A* to this Decision and Order. The purpose of the Media Rules are stated as follows:

(1) To provide public access to the courts while ensuring the right of any party to fair judicial proceedings; (2) to acknowledge the existence of new technology and to permit is use in and around the court, subject to restriction; (3) to avoid delay or interference in judicial proceedings; and (4) to maintain appropriate courtroom decorum.

*Rule 1.* Failure to comply with the Media Rules is deemed to be "an unlawful interference with the judicial proceedings of the court and may be the basis for an order terminating electronic coverage, and order for contempt of court, cancellation or suspension of media credentials or an order imposing monetary or other sanctions." *Rule 12.* In this case, Ms. Hernandez, whose Media Request was approved, attended the proceedings on July 17, 2025, as a member of the media, subject to the Media Rules. She certified compliance with the Media Rules "and any additional instructions or restrictions imposed by the judge or the Judiciary." *Exhibit A,* Certification.

During the jury selection on July 17, 2025, Ms. Hernandez entered (and was permitted to enter) while the proceedings were already in progress, despite the 15-minute requirement under Rule 10(c) requiring all media to be "in place at least fifteen minutes prior to the scheduled time of commencement of the judicial proceeding." Additionally, upon entry into a courtroom full of prospective jurors, the loud noise caused by her opening the door caused the jurors and the Court to be distracted from the proceedings. *Hrg. of 7/28/25* at 9;10:09 AM to 9:14:39 AM (at sidebar). Undeterred by the distraction caused by her untimely entry into the jury selection, Ms. Hernandez then left the courtroom prior to a break in the proceedings, causing another loud sound by her exiting the courtroom, once again distracting the jury and the Court – which was fully engaged in addressing jurors at sidebar – by her departure prior to a break in the proceedings. Marshals were

instructed not to allow her re-entry into the courtroom until a break in the proceedings in order to curb further distracting the court or the venire.

Ms. Hernandez's violation of Rules 10(c) and (f), which occurred in the presence of the Court, subjects her and/or Pacific Daily News to sanctions under Rule 12, including an order for contempt of court, the cancellation or suspension of Ms. Hernandez's media credentials or an order imposing monetary or other sanctions.

**B. The Court's refusal to permit Ms. Hernandez to re-enter the courtroom after her departure caused the Court and jury to be distracted by her movement is not a "closure" under the Sixth Amendment right to a public trial.**

The purpose of jury selection is to ensure that a fair, impartial, and unbiased jury is empaneled to decide a case. This process is fundamental to upholding the constitutional rights of the accused, including the right to a trial by an impartial jury as guaranteed by the Sixth Amendment to the U.S. Constitution. Thus, the process of selecting a fair, impartial and unbiased jury is as important to a Defendant as the right to a "public trial" under the Sixth Amendment. Unlike the guarantee of a fair, impartial and unbiased jury, however, a defendant's right to a public trial is not absolute and may give way in certain cases to other rights or interests. *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210 (1984)("the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial..."). See also, *Bell v. Evatt*, 72 F.3d 421, 432–33 (4th Cir. 1995); *US v. Villagomez*, 708 F.Supp.2d 1105 (D.Ct. N.M.I. 2010); *Presley v. Georgia,* 558 U.S. 209, 130 S.Ct. 721 (2010).

At the outset, the Court recognizes that the denial of a defendant's right to a public trial by closing the proceedings is a structural error which requires an automatic reversal. *Waller,* 467 U.S. at 48 (closure of *entire* suppression hearing violated public trial guarantee; however, under certain

circumstances, these interests [in protecting privacy of persons not before the court] may well justify closing portions of suppression hearing to the public."). The Court's denial of reentry to Ms. Hernandez until a break in the proceedings for her disruptive behavior in violation of the Media Rules does not result in a "closure" implicating the Sixth Amendment. A "closure" of a courtroom occurs:

> when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave. This does not apply to every proceeding that transpires within a courtroom but certainly applies during trial and extends to those proceedings that cannot be easily distinguished from the trial itself. This includes pre- and posttrial matters such as voir dire, evidentiary hearings, and sentencing proceedings. This definition is likely underinclusive and may be expanded on by later cases with different facts. But, with this minimal definition in place, and under these facts, we reject the holding of the Court of Appeals that a closure occurred during Lormor's trial.

*State v. Lormor*, 172 Wash.2d 85, 93, 257 P.3d 624, 629 (2011). In that case, the trial court excluded Defendant's daughter, "who was four days shy of her fourth birthday," from the courtroom before trial and who required a ventilator to help her breathe, as well as a wheelchair for accessibility. *Id.* In excluding her from the courtroom, the judge declared on the record:

> Number one, at that age I don't know how much she would understand of the proceedings. Two, given the setup *I could even hear at the bench the ventilator operating, and I concluded that would be an inappropriate distraction* and frankly difficult for her as it would be potentially distracting for the jury.

*Id.* at 88. However, the court found that a "closure" did not occur by the exclusion of a single individual for what the judge deemed to be an unacceptable distraction:

> Lormor's trial was conducted in an open courtroom. No showing is made that public attendance during the trial, or at any other stage, was prohibited. While it is unclear from the record whether there were any other observers in the courtroom, what is clear is that only one person was excluded, and there was no general prohibition for spectators or any other exclusion of the public. Our cases establish *93 when a closure occurs. For example, Lormor's entire family was not excluded as occurred

in *Orange,* 152 Wash.2d at 807, 100 P.3d 291. The doors were not closed to all spectators as happened in *Brightman,* 155 Wash.2d at 511, 122 P.3d 150. The defendant was not prohibited from attending a portion of the trial like the defendant in *Easterling,* 157 Wash.2d at 172, 137 P.3d 825. Nor was any part of the proceeding conducted in an inaccessible location such as the judge's chambers as happened in both *Momah,* 167 Wash.2d at 146, 217 P.3d 321, and *Strode,* 167 Wash.2d at 224, 217 P.3d 310. Factually, the exclusion of one person, without more, is simply not a closure under those scenarios.

*Id.* at 92–93.

Additionally, the court in *Lormor* found that the trial court possessed broad discretion in exercising its authority over courtroom operations:

Since we find that no closure exists, we analyze this case as the trial court did, as a matter of courtroom operations, where the trial court judge possesses broad discretion. In addition to its inherent authority, the trial court, under RCW 2.28.010 has the power to preserve and enforce order in the courtroom and to provide for the orderly conduct of its proceedings. **The power to control the proceedings must include the power to remove distracting spectators, or else it would be meaningless.** Any other rule would leave a trial court judge unable to keep the order necessary for a fair proceeding. And it would make little sense to engage in a Bone–Club or Waller analysis every time an unruly spectator is ejected from the courtroom, and, given our definition of "closure," no such analysis is required.

*Id.* at 93–94. The court's authority under RCW 2.28.0101 is virtually identical to that of this Court's powers under 7 GCA § 7107 and provides:

Every court of justice has power--(1) To preserve and enforce order in its immediate presence. (2) To enforce order in the proceedings before it, or before a person or body empowered to conduct a judicial investigation under its authority. (3) To provide for the orderly conduct of proceedings before it or its officers. (4) To compel obedience to its judgments, decrees, orders and process, and to the orders of a judge out of court, in an action, suit or proceeding pending therein. (5) To control, in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter appertaining thereto. (6) To compel the attendance of persons to testify in an action, suit or proceeding therein, in the cases and manner provided by law. (7) To administer oaths in an action, suit or proceeding pending therein, and in all other

cases where it may be necessary in the exercise of its powers or the performance of its duties.

*Id.* at 94 (citing Wash. Rev. Code Ann. § 2.28.010 (West)).

In *People v. Colon*, 521 N.E.2d 1075, 1078-1079 (Ct. App. N.Y. 1988), the Appellate Court ruled that a trial court judge's order to lock the courtroom during the charge to the jury but permitting all observers to had timely arrived to remain in the courtroom, does not constitute a "closure" of the proceedings. In that case the New York Court of Appeals reasoned:

> Defendant's premise, however, that locking the courtroom doors during the charge to the jury results in a "closure" of the proceedings, does not withstand analysis. Unlike orders explicitly excluding members of the public, the trial court's action here does not explicitly exclude anybody and *is designed solely to regulate the ingress and egress of the spectators. The right to a public trial has always been recognized as subject to the inherent power of trial courts to administer the activities of the courtroom; suitably within the trial court's discretion is the power to monitor admittance to the courtroom, as the circumstances require, in order to prevent overcrowding, to accommodate limited seating capacity, to maintain sanitary or health conditions, and generally to preserve order and decorum in the courtroom* (*People v. Glover*, 60 N.Y.2d 783, 469 N.Y.S.2d 677, 457 N.E.2d 783; *People v. Jelke*, 308 N.Y. 56, 63, 123 N.E.2d 769, *supra*; *People v. Miller*, 257 N.Y. 54, 60, 177 N.E. 306). Locking the doors during the charge to avoid disruption—allowing those already present to remain—does not seek to exclude the public or frustrate the salutary purposes of public scrutiny. *Here, members of the press or public were permitted to attend the charge to the jury, upon the condition that they arrive at the beginning of the court's delivery and not leave until instructions had been completed.*
>
> Focusing on the tardy spectator, defendant nevertheless insists that locking the doors during the charge is the functional equivalent of a "closure" with respect to that spectator. This argument, however, would render a "closure" any restriction on admittance to the courtroom, even for example, because of limited seating capacity.4 Rather, we view the Trial Judge's action here as a reasonable restriction upon the time and manner of public access to the trial (see, *United States v. Romano*, (2nd Cir.1982), 684 F.2d 1057, 1065), "Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial" (*Richmond Newspapers v. Virginia*, 448 U.S. 555, 581, n. 18, 100 S.Ct. 2814, 2830, n. 18, supra [citations omitted] ). Those cases requiring no less onerous alternative and "specific findings" made on the record to warrant a closure of the

proceedings are therefore inapplicable (see, *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 2214–15, supra; *Press–Enterprise I*, 464 U.S. 501, 510, 104 S.Ct. 819, 824, supra; *Matter of Associated Press v. Bell*, 70 N.Y.2d 32, 39, 517 N.Y.S.2d 444, 510 N.E.2d 313, *supra* ). So long as the time and manner restriction on admission is a reasonable one, it should be upheld against defendant's Sixth Amendment challenge.

The charge to the jury is a solemn and comparatively complex phase of the trial requiring precision and concentration on the part of both the jury and the Trial Judge. Although it is no more critical to defendant's guilt or innocence, for example, than the testimony of a principal witness, the charge is of special significance. It is during the charge that the jury is instructed on the law applicable to the case, the time they must master often difficult and interrelated principles—principles not usually within their ken—that may be determinative of the outcome. The discourse is imbued with terms not immediately comprehensible, requiring definition, repetition and context. Moreover, the charge, by its nature, occupies the Trial Judge's full attention placing him or her in a particularly disadvantageous position to police the goings-on in the courtroom. Thus, it cannot be said to be an unreasonable limitation on public access—after inviting all those present to remain—to lock the doors so that the charge may be conveyed without disruption. Indeed, incessant interruptions during the charge could very well give rise to repeated requests for supplemental instructions. We reach no conclusion with respect to the propriety of routinely locking the doors during other portions of the trial, or indeed for the duration of the proceedings between recesses (see, *State v. Robillard*, 146 Vt. 623, 508 A.2d 709 [routine practice of locking doors after commencement of actual trial proceedings until recess is error]; *People v. Micalizzi*, 223 Mich. 580, 194 N.W. 540).

In sum, we conclude that a Trial Judge's order to lock the courtroom doors during the charge to the jury, permitting all those who have timely arrived to remain in the courtroom, is not intended to exclude members of the public and does not constitute a "closure" of the proceedings. ***Rather, it is designed to control the flow of traffic into and out of the courtroom during a unique portion of the trial where the jurors must absorb and master the applicable legal principles and the Trial Judge is singly devoted to assuring comprehension of these principles.*** The decision to do so is within the discretion of the Trial Judge to assure tranquility and order in the courtroom. We hold, therefore, that the locking of courtroom doors during the charge to the jury—preventing only tardy spectators from entering the courtroom during this time—does not deprive defendant of his constitutional right to a public trial.

*People v. Colon*, 71 N.Y.2d 410, 416–18, 521 N.E.2d 1075, 1078–80 (Ct. App. N.Y. 1988)(emphasis added).

Similarly, in this case, this Court was distracted by Ms. Hernandez's loud ingress and egress from the courtroom during *voir dire*. Media are instructed by the Media Rules that their movement is restricted so as not to attract undue attention; however, Ms. Hernandez distracted the Court as well as members of the venire when she entered and then left the courtroom without concern for the sound of the courtroom door. The Court did not prohibit all other observers from entering and exiting the courtroom because they (1) are not subject to the Media Rules, and (2) Ms. Terlaje and Ms. Borja were mindful of reducing the distraction by opening the courtroom door slowly and purposefully to mitigate the noise. Additionally, Ms. Hernandez has appeared as a media representative in this Court's courtroom and has been informed of all the rules regarding movement, but has, on several occasions, disregarded such rules, including the 15-minute rule as well as recently moving around the courtroom to take a photograph of the witness on the witness stand, in violation of Rule 10. However, as the Court in *Colon* has reasoned that the charging of a jury is a solemn phase of the trial requiring "concentration on the part of both the jury and the trial judge," so too is the duty of ensuring that a fair, unbiased and impartial jury is empaneled for the Defendant's trial.

Numerous courts echo the inherent power of trial courts to administer activities in the courtroom and to control the proceedings to preserve order and decorum in the courtroom. See, *United States v. Scott*, 564 F.3d 34, 36–39 (1st Cir. 2009) (rejecting a defendant's claim that his Sixth Amendment right to a public trial was violated when the court barred members of the public from entering or leaving the courtroom while the court was charging the jury, "presumably to avoid distracting the jury during the ... charge," concluding that no closure had occurred because the "public was indeed present at the jury charge and with its presence cast the sharp light of public

scrutiny on the trial proceedings, thus providing the defendant with the protections anticipated by the public trial provision of the Constitution," and "that a hypothetical member of the public who arrived late ... might have been barred from the proceedings does not undermine the public nature of the proceedings"); *Bell v. Evatt*, 72 F.3d 421, 433 (4th Cir.1995) ("[A] defendant's right to a public trial is not implicated by temporary limitation of ingress and egress to the courtroom to prevent disturbance of the proceedings."); *Knapp v. Leonardo*, 46 F.3d 170, 177 (2nd Cir.1995) (holding that defendant's Sixth Amendment right to a public trial was not violated by the fact that defendant's trial was held in a church hall, due to renovations being performed on the county courthouse, where the location of the trial did not restrict the public's access to the trial); *Herring v. Meachum*, 11 F.3d 374, 380 (2d Cir.1993) (holding that trial was never "closed," even though the court locked the courtroom doors during the jury charge, because all members of the public who wanted to observe the charge were permitted to do so if there was enough space and they arrived in time); *Douglas v. Wainwright*, 739 F.2d 531, 532–33 (11th Cir.1984) (concluding that exclusion of members of the public from the courtroom during testimony of one witness in the case did not constitute a Sixth Amendment violation where "the press and family members of the defendant, witness, and decedent were all allowed to remain"), *cert. denied*, 469 U.S. 1208 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *US v. Villagomez*, 708 F.Supp.2d 1105 (D.Ct. N.M.I. 2010)(court rejected claim that Defendant was denied a "public trial" by allowing members of the public to sit in unoccupied reserved seats in the courtroom).

//

//

//

//

## C.     Defendant's reliance on *US v. Rivera* and *Mendiola* is misplaced.

The case of *US v. Rivera* cited to by Defendant is inapposite here. In that case, the District Court excluded from the Defendant's sentencing hearing his 7-year old child and *all of his family* from a Sentencing Hearing. However, the court therein ruled that the presence of Defendant's family was integral to that proceeding:

> The presence of the public at sentencing reminds the participants, especially the judge, that the consequences of their actions extend to the broader community. Friends and family members, especially a defendant's young children, are particularly effective in this regard, because they are the individuals most likely to be affected by the defendant's incarceration. Cf. U.S.S.G. § 5H1.6 (stating that "family ties and responsibilities are not ordinarily relevant" in deciding whether to depart below a Guidelines sentence, but application notes authorize departures when the defendant's sentence "will cause a substantial, direct, and specific loss of essential caretaking"). Moreover, a child's ingenuousness may have an intensely sobering effect on the responsible adults, including on the person being sentenced. Because the closure at issue in this case concerned sentencing proceedings, the absence of Rivera's young child frustrated Sixth Amendment values—particularly, the value of reminding the participants of the importance of the occasion.
>
> Furthermore, the district judge did not, in fact, exclude only Rivera's child from the proceedings; he excluded all of the family members Rivera wished to have present.
>
> \*\*\*\*
>
> Although the district judge, at one point, indicated that he intended to "reconvene this sentencing just with the adults," he had originally expressed a preference for a closed courtroom; said, without qualification, that he "want [ed] to clear th[e] courtroom";4 and subsequently stated—in response \*1231 to defense counsel's attempt at clarification ("And no family, just my client")—that counsel should "[f]orget the manipulation" and that the proceeding should include "[j]ust the people involved." When the proceedings resumed on August 27, the only people present were the judge, the prosecutor, defense counsel, defense counsel's investigator, and Rivera himself. Observing the cleared courtroom, the district judge remarked: "This is the way a courtroom ought to look." ***Taken together, the district judge's comments evince a definite intent fully to "clear the courtroom," thereby excluding all of Rivera's family members from the proceedings.***

*United States v. Rivera*, 682 F.3d 1223, 1230–31 (9th Cir. 2012).

In determining whether the closure amounted to a violation of Defendant Rivera's 6th Amendment right, the Court considered the following factors:

> First, the district court excluded Rivera's family members from the August 27 hearing. Our sister circuits have interpreted the Supreme Court's statement in Oliver—that the defendant is entitled to have "at the very least ... his friends, relatives and counsel present" during criminal proceedings, *Oliver*, 333 U.S. at 272, 68 S.Ct. 499 (emphasis added)—as expressing "special concern for assuring the attendance of family members of the accused." *Vidal*, 31 F.3d at 69; see also Guzman v. Scully, 80 F.3d 772, 776 (2d Cir.1996) ("The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly.") (emphasis added). The exclusion of Rivera's relatives thus implicates Sixth Amendment values more directly than the exclusion of the general public.
>
> Second, during the hearing, matters of vital importance were discussed and decided: The court computed Rivera's Sentencing Guideline range, heard closing statements from defense counsel and a personal statement from Rivera, weighed the § 3553(a) factors, and imposed its sentence. The Supreme Court has long recognized "the critical nature of sentencing in a criminal case," Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), and the August 27 hearing in this case is no exception. Given the vital importance of the material discussed at the hearing, and the deliberate exclusion of Rivera's family members from that proceeding, the closure at issue in this case is nothing like those at issue in Ivester and Peterson.
>
> We conclude that the district court's exclusion of Rivera's family members from the August 27 hearing implicated important values served by the Sixth Amendment. Most saliently, the district judge imposed Rivera's sentence free from the watchful eyes of Rivera's family members, and thus without the most significant reminders of the importance of the court's sentencing function and the gravity of its actions. The closure was therefore not trivial.

*United States v. Rivera*, 682 F.3d 1223, 1232 (9th Cir. 2012). As distinguished from the case at bar, the presence of Rivera's family was significant as a reminder to the court of the impact of sentencing on them and on the community. In this case, the gravity of selecting a jury is the reason why this Court did not permit Ms. Hernandez to return to the courtroom when she left the

courtroom in the middle of the *voir dire* of the panel as her movement distracted the Court and other members of the jury panel. Nor did the Court "clear the courtroom" as in *Rivera*. Indeed, members of the public, including Ms. Terlaje, who observed that Ms. Hernandez was refused re-entry into the courtroom, were permitted into the proceedings. See, Exhibit A to Supplemental Declaration of Joseph C. Razzano In Support of Mot. for Evidentiary Hrg. to Determine Whether New Trial is Necessary (Jul. 25, 2025).

Additionally, the Defendant cites to *People v. Mendiola,* 2023 Guam 12,[7] as supporting a finding that the refusal to allow Ms. Hernandez re-entry under the circumstances amounted to a Sixth Amendment violation. In contrast to the facts of *Mendiola,* where the public was not present during the entirety of *voir dire,* members of the public and Ms. Hernanderz were permitted entry during *voir dire* on July 16, July 17, and July 18, 2025. It was only after Ms. Hernandez violated Rule 10 of the Media Rules on July 17 that she was not permitted to re-enter until a break in the proceedings. The proceedings at all times remained open to the public.

## CONCLUSION

For the reasons set forth herein, Defendant's Motion for Evidentiary Hearing or, in the alternative, for a mistrial is **DENIED**.

SO ORDERED this 4th day of August, 2025.

_____
HONORABLE MARIA T. CENZON
Judge, Superior Court of Guam

---

[7] The question before this Court is one of first impression in Guam. The Guam Supreme Court has not been asked to address the issue of a violation of the Media Rules in the context of a Defendant's right to a "public trial". Notably, the Media Rules provides that "No appellate review of the interpretation or application of the Rules shall be available to the media or the parties. The media or parties may, however, seek extraordinary relief by way of writ petition."

SERVICE VIA EMAIL
I acknowledge that an electronic copy of the original was e-mailed to:

OAG & Razzano

Date: 8|4|25 Time: 1:51
Reinita M. Lindlau
Deputy Clerk, Superior Court of Guam

  

# JUDICIARY OF GUAM

Administrative Office of the Courts
Guam Judicial Center • 120 West O'Brien Dr • Hagåtña, Gu. 96910
Tel: (671) 475-3544 • Fax: (671) 477-3184

## MEDIA REQUEST FOR ELECTRONIC COVERAGE
## OF JUDICIAL PROCEEDINGS

**1. Date of Request:** 07/15/25

**2. Media Organization:** Pacific Daily News

**4. Case No.:** CF0243-25

**5. Title of Case:** People vs. Jathan John Pnagelinan Tedaotao

**6. Name of Judge** *(if known)*: Maria T. Cenzon

**3. Name(s) of employee(s) who will be in the courtroom:**

a) Julianne Hernandez

Telephone No. 671-747-1838

b) Ricky Cruz/Julianne Hernandez

Telephone No. 1-483-4380/671-747-18

**1. Type of Hearing** *(e.g. magistrate, arraignment, motion hearing, jury trial, etc.)*:
Trial

**2. Date and Time of Proposed Coverage** *(specify)*: 07/17/25

Date         Time

**3. Compliance Statement:**
For initial appearances in criminal proceedings, this request shall be submitted at least 24 hours prior to the judicial proceeding. For Superior Court proceedings, this request shall be submitted at least three (3) business days prior to the judicial proceeding. For Supreme Court proceedings, this form shall be submitted at least 24 hours prior to the judicial proceeding. If this request is untimely, indicate the reason(s) for noncompliance:

I understand that jury selection is tomorrow (07/16) but this is for the duration of the trial itself and time fo

has not been set yet. Was at the hearing in Judge Maria Cenzon's court that jury selection may continue

Friday and opening statements might start next week. *JURY SELECTION CONTINUES THIS AFTERNOON (7/17*

@ 1:30 PM WITH OPENING STATEMENTS & GOV'T'S CASE IN CHIEF AROUND 3 PM. *JMTC*

**4. Certification:**
I certify that if the judge permits media coverage in this case, all participating personnel in this media organization will be informed of and will abide by the provisions of the Judiciary of Guam Rules Governing Electronic Coverage of Judicial Proceedings, the provisions of any court order, and any additional instructions or restrictions imposed by the judge or the Judiciary.

**Applicant Signature:** Julianne Hernandez      **Dated:** 07/15/25

---

### TO BE FILLED OUT BY THE JUDGE PRESIDING OVER THE CASE:

☒ APPROVED      ☐ DISAPPROVED

Additional Instructions, *if any*:
SUBJECT TO RULES INCL NO VIDEO/STILL OF COURTROOM CLERK MS. BALBAS OR JUDGE.

**Judge's Signature:**      **Dated:** 7/17/2025

EXHIBIT A